UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division

SECURITIES AND EXCHANGE )
COMMISSION, )
)
      Plaintiff, )
)
  vs. ) Case No. 8:08-cv-
) 993-T-27-MAP
GLOBAL DEVELOPMENT & )
ENVIRONMENTAL RESOURCES, )
INC., PHILIP PRITCHARD, )
PIETRO CIMINO, DANTE M. )
PANELLA, DARKO S. MRAKUZIC, )
ANTHONY M. CIMINI, SR., and )
CARMINE J. BUA, )
)
      Defendants, )
)
)
QUANTUMVEST HOLDINGS, LTD., )
)
      Relief Defendant. )
)
)
)
)
)

DEPOSITION

of

DARKO MRAKUZIC

April 24, 2009

Held at the offices of Harper Grey LLP
3200 Vancouver Centre, 650 West Georgia Street
Vancouver, British Columbia, Canada  V6B 4P7

REPORTED BY:

EXHIBIT
2
PENGAD-Bayonne N J

Page 2

APPEARANCES

For the Plaintiff:

BRIAN K. BARRY, Esq.
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.982.6300
Fax: 305.536.4154
RACHEL PAULOSE, (via conference call)
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.982.6300
Fax: 305.536.4154

For the Defendant, Darko S. Mrakuzic, and Relief Defendant Quantumvest Holdings, Ltd.

MARK K. BRASWELL, Esq.
BRASWELL LAW GROUP
1319 T Street NW
Washington, D.C. 20009-4438
Telephone: 202.332.3488
Fax: 202.332.8337

Page 4

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 75 | Composite document, production to the Securities and Exchange Commission from the British Columbia Securities Commission, Bates labelled number 1 through 53, marked "Confidential" | 116 |
| Exhibit 76 | Composite document commencing with Bates No. 000112 through to 000203, marked "Confidential", materials provided to the BC Securities Commission from Golden Capital Securities Ltd." | 128 |
| Exhibit 77 | Composite document commencing with Bates No. 000204 through to 000291, marked "Confidential", materials provided to the BC Securities Commission from Golden Capital Securities Ltd." | 135 |
| Exhibit 78 | Documents with Bates Nos. 1 through 15, Rahn & Bodmer, Zurich | 138 |
| Exhibit 79 | One-page document, Bates No. DM-155, e-mail from Peyer Markus Hr. to Darko Mrakuzic, August 10, 2005 | 143 |
| Exhibit 80 | One-page document, Bates no. DM-156, e-mail from Peyer Markus Hr. to Darko Mrakuzic, dated August 11, 2005 | 146 |
| Exhibit 81 | One-page document, Bates no. DM-157, e-mail from Peyer Markus Hr. to Darko Mrakuzic, dated August 16, 2005 | 148 |
| Exhibit 82 | Composite document, Bates nos. DM-167 through to DM-176 and then DM-178 to DM-185, Rahn & Bodmer Zurich, dated August 3, 2005 | 149 |
| Exhibit 83 | Four-page document, Bates nos. NF-17 through to NF-20, Edition of "The Gripper" | 158 |

Page 3

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Barry | 6 |
| Mr. Braswell | 182 |
| Mr. Barry | 184 |

***

EXHIBIT INDEX

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit 70 | Nine-page document, Bates Nos. DM-022-A through to DM-023, entitled "In the Matter of Discipline Pursuant to By-Law 20 of the Investment Dealers Association of Canada, Re: Darko Stjepn Mrakuzic, Settlement Agreement" | 14 |
| Exhibit 71 | Bates No. DM-027, one-page document, Citi U.S. Dollar MasterCard Statement statement date 07/14/2005 | 69 |
| Exhibit 72 | Two documents compiled, Bates Nos. DM-031 to DM-032, telegraphic transfer application form, HSBC Bank Canada, White Rock South Pt., dated June 17, 2005 | 96 |
| Exhibit 73 | One-page document, Bates No. DM-034, Telegraphic Transfer Application Form, HSBC Bank Canada, White Rock South Pt. Office, June 21, 2005 | 99 |
| Exhibit 74 | Two-page document, Bates Nos. DM-008 and DM-009, document headed "Private Stock Purchase/Stock Exchange Agreement" | 113 |

Page 5

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 84 | Two-page document, Bates nos. NF-21 through NF-22, edition of "The Gripper" dated August 4, 2005 | 160 |
| Exhibit 85 | One-page document, Bates no. NF-46, edition of "The Gripper" dated August 17, 2005 | 161 |
| Exhibit 86 | Three-page document, Bates nos. NF-43 to NF-45, edition of "The Gripper" dated August 17, 2005 | 162 |
| Exhibit 87 | Four-page document, Bates nos. NF-49 through to NF-52, edition of "The Gripper" dated August 18, 2005 | 163 |
| Exhibit 88 | Two-page document, Bates nos. NF-57 and NF-58, edition of "The Gripper" dated August 22, 2005 | 164 |
| Exhibit 89 | Two-page document, Bates nos. NF-66 and NF-67, edition of "The Gripper" dated August 23, 2005 | 164 |
| Exhibit 90 | One-page document, Bates no. DM-033, Telegraphic Transfer Application Form, HSBC Bank Canada, White Rock South Point office, dated August 22, 2005 | 170 |
| Exhibit 91 | Document entitled "Declaration of Darko Mrakuzic" | 176 |

| ********** Reporter's Note ********** | 62 |

It's Dwayne or -- I'm sorry, I can't recall his exact name.

Q. And where does this Dwayne live?

A. He lived in Vancouver. The name started with a "D".

Q. So you're not sure if it's "Dwayne", but it started with a "D"?

A. It started with a "D", and "Dwayne" comes to mind, but I'm not 100 percent certain that that is the correct name.

Q. And in between the time you had worked at Pacific International Securities and Cryoport, had you conducted any business with Mr. Pollock?

A. I don't believe so, no.

Q. What else did you discuss with Mr. Pollock regarding Cryoport?

A. Those were the essential elements.

Q. Did Mr. Pollock assist you in any way in locating a shell corporation for Cryoport?

A. I don't believe he did.

MR. BRASWELL: Brian, let's take a five-minute break if you don't mind.

MR. BARRY: Sure, we can take a five-minute break.

(Recess taken.)

MR. BRASWELL: Just so we know where we are, can we have the last question and answer read back.

(Record read.)

BY MR. BARRY:

Q. Have you worked with Mr. Pollock in any other respects with the Cryoport transaction?

A. Can you be more specific, please?

Q. Did Mr. Pollock have any involvement at all with Cryoport, to your knowledge?

A. The company, private company, no.

Q. Regarding the shell corporation, did he have any involvement whatsoever with shell corporations that you're aware of?

A. I don't believe so.

Q. Do you know an individual named Anthony Anish?

A. Yes.

Q. How do you know Mr. Anish?

A. I met him on a trip to Los Angeles.

Q. How did you meet him?

A. I believe the first time I met him was at lunch with Mr. Panella and several of the Gateway principals.

MR. BRASWELL: Gateway or Global?

THE WITNESS: That was the Gateway.

BY MR. BARRY:

Q. And this was in Los Angeles, you say?

A. Orange County, Los Angeles, yeah.

Q. When was that?

A. The date I don't recall, but it was before Global, so I'm thinking maybe 2004 would be a guess.

Q. What connection did Mr. Anish have to Gateway, if any?

A. My understanding was he provided accounting services for Gateway.

Q. Did you conduct any business with Mr. Anish with regards to Gateway?

A. No.

Q. Have you conducted any business with Mr. Anish at all?

A. I don't believe so.

Q. Did Mr. Anish have any involvement or association with Cryoport?

A. I don't know.

Q. Do you know an individual by the name of Linwood Meehan, also known as Trey Meehan?

A. Yes.

Q. How do you know him?

A. I've never met him personally. I know him through Dante.

Q. Did Mr. Panella introduce you, then, to Mr. Meehan?

A. I believe we maybe spoke once or twice. And Mr. Dante -- it was, like, a three-way conference call.

Q. What was that conference call about?

A. I don't recall.

Q. Do you recall when that was?

A. No, I don't.

Q. What do you understand Mr. Meehan's business to be?

A. He hosts a website and he writes about companies.

Q. Are you aware of any other business Mr. Meehan conducts?

A. I believe he was a principal in a company called Redux.

Q. What is Redux?

A. What was it? I can't recall.

Q. Was Redux a public company in the United States?

A. Yes, it is.

Q. Did you invest in Redux?

A. Yes, I did.

Q. Aside from investing in Redux, did you have any association with that company?

A. No.

Q. And how did Redux become a publicly traded company?

A. I don't recall the history of it.

Q. When you acquired shares in Redux, was it a publicly traded company?

A. Yes.

Q. How did you acquire those shares?

A. I acquired some through the open market and I acquired some shares privately from Mr. Meehan.

Q. How many shares did you acquire from Mr. Meehan?

A. I can't recall.

Q. How much did you pay Mr. Meehan for those shares?

A. I believe $50,000.

Q. Were those shares restricted?

A. I'm not certain.

Q. Do you still hold any of those shares?

A. Yes.

Q. How many shares do you still hold of Redux?

A. I don't recall.

Q. What is the ticker symbol for Redux?

A. I believe it's RDXH.

Q. Did Mr. Panella have any association with Redux that you're aware of?

A. I believe he did, but I don't know what his role was or what his association was.

Q. How did you hear about the company Redux?

A. From Mr. Panella.

Q. Do you know if Mr. Anish had any association with Redux?

A. I have no idea.

Q. How about Mr. Pollak, do you know if he had any involvement at all with Redux?

A. I don't believe so.

Q. Aside from Redux, have you conducted any business with Mr. Meehan?

A. Mr. Meehan was involved with Global. But as far as any other business, no.

Q. Was Mr. Meehan involved in any way in Cryoport?

A. I believe Mr. Meehan had some investors that

bought shares in Cryoport. And also he periodically writes a letter on his website.

Q. How about Gateway, did Mr. Meehan have any involvement with Gateway?

A. Don't know.

MR. BRASWELL: Can we take a break?

THE WITNESS: A 10-minute bathroom break.

MR. BARRY: Sure.

(Recess taken.)

BY MR. BARRY:

Q. With regards to Mr. Meehan, do you know if he had any involvement at all with Cal-Bay?

A. No, I don't know.

Q. Are you familiar with a company named David Loren?

A. Yes.

Q. And "Loren" is L-O-R-E-N, for the record. How are you familiar with that company?

A. I'm an investor.

Q. And how did you become an investor in David Loren?

A. Through Mr. Panella.

Q. What role did Mr. Panella, or, excuse me, what association did Mr. Panella have with David

Loren?

A. I'm not sure. Sorry, in what capacity?

Q. Was Mr. Panella an officer or director of David Loren?

A. No, I don't believe so.

Q. Did Mr. Panella tell you how he learned of David Loren as a company?

A. He might have told me how he met him, but I don't recall the circumstances.

Q. And what is the company David Loren?

A. A clothing wholesaler, manufacturer. They sell to supply retail outlets with women's clothing.

Q. Is David Loren a publicly traded company in the U.S.?

A. Yes, it is.

Q. Do you know how David Loren became a publicly traded company?

A. I believe it was through a reverse merger.

Q. And did you acquire your shares before David Loren was a public company?

A. No.

Q. How did you acquire your shares?

A. Through a private transaction with Mr. Panella.

Q. How many shares did you buy from Mr. Panella?

A. I don't recall.

Q. Were those shares restricted?

A. Yes, I believe so.

Q. Do you still hold those shares?

A. Yes.

Q. What percentage of those shares do you still hold?

A. 100 percent of what I purchased because of -- because they were restricted.

Q. They are still restricted?

A. I believe so.

Q. Do you know if Mr. Meehan had any association at all with David Loren? The company, that is.

A. The company?

Q. Yes.

A. Not sure. I don't believe so. I'm not certain.

Q. And I guess I should break that down. Do you know if he had any, Mr. Meehan, that is, had any involvement with the shell corporation prior to the merger?

A. I don't believe so.

Q. Okay. And then the same question, then; after the merger, do you know if Mr. Meehan had any involvement with David Loren?

A. Again, I'm not certain.

Q. Outside of being an investor in the company David Loren, did you have any involvement in the reverse merger transaction?

A. Yes.

Q. What was your role?

A. I identified the shell.

Q. How did you identify the shell?

A. I'm sorry, I don't have an answer to that question.

Q. Do you mean you don't know how you identified the shell?

A. By how identified? Can you please rephrase that?

Q. Okay. You said you identified the shell, right?

A. Yes.

Q. Who asked you to identify the shell?

A. Mr. Panella.

Q. And after Mr. Panella asked you to identify

the shell, what did you do?

A. I made some phone calls to see if there were any shells available.

Q. Okay, who did you call?

A. I called a couple of brokers, other friends of mine who might have access to people who know shells. Just you put the word out.

Q. Specifically who did you call?

A. I can't remember exactly who I called.

Q. Did you call Mr. Pollak?

A. No.

Q. You can't remember any names of anyone that you called with regards to attempting to identify a shell for David Loren?

MR. BRASWELL: Objection, argumentative.

MR. BARRY: It's a question.

THE WITNESS:

A. My recollection is not -- I don't have a recollection of that. And I don't wish to throw a name out there and it not be -- and it be not correct.

BY MR. BARRY:

Q. Did you eventually locate a shell corporation for David Loren, then?

A. Yes.

Q. What was the name of that shell corporation prior to the reverse merger?

A. I don't recall offhand.

Q. When did this transaction take place, the reverse merger?

A. Approximately, I'm guessing, two to three years ago. And that information is available in the files.

Q. What files are you referring to?

A. SEC files, OTC, Pink Sheets, on the internet.

Q. Just to make sure we're clear, I'm going go back some because I've referred generally to certain company names before without breaking it down as to shell corporation pre-merger and the company post-merger. So with respect to Cal-Bay International, or Cal-Bay, excuse me, did you have any role with the shell corporation prior to reverse merger?

A. No.

Q. So any involvement you had with Cal-Bay was after the company became a publicly traded company?

A. I believe so, yes.

Q. Same thing with respect to Gateway, did you have any role with the shell corporation prior to the reverse merger?

A. I don't believe so, no.

Q. So any involvement your had with Gateway was after the company had become a publicly traded company?

A. Yes, I believe so.

Q. We've already discussed Cryoport, that you did have a role in connection with identifying the shell corporation; is that right?

A. Correct.

Q. And with respect to Redux, did you have any role with respect to -- or did you have any involvement with the shell corporation prior to the reverse merger?

A. I don't believe so.

Q. Aside from David Loren and Cryoport, has Mr. Panella contacted you to identify a shell corporation for any companies?

A. We had discussed some possibilities, yes.

Q. And what were those possibilities?

A. I'm trying to remember. We were always...
A company called Optimizer.

Q. Was that the name of the operating company?

A. Yes.

Q. And what happened with respect to Optimizer?

A. I believe they went public.

Q. And did you locate the shell for Optimizer?

A. I assisted in that, yes.

Q. Who else assisted in that?

A. It was done through an attorney out of Seattle.

Q. What's the name of the attorney?

A. Jim Vandeburg.

Q. When you say you assisted in it, what do you mean?

A. I invested in the company.

Q. Did you invest in the shell corporation prior to the reverse merger?

A. Yes.

Q. What was the name of the shell corporation before the reverse merger?

A. I don't recall.

Q. Who was the management of the shell corporation before the reverse merger?

A. I don't recall.

Q. What was Mr. Panella's involvement with

Optimizer?

A. I believe he invested money in Optimizer.

Q. How many shares did you have of Optimizer?

A. I don't recall offhand.

Q. Were those shares restricted?

A. No.

Q. How did you acquire those shares?

A. Through a debt conversion.

Q. When was that?

A. A couple years ago.

Q. How many years ago?

MR. BRASWELL: Objection, asked and answered.

THE WITNESS:

A. One or two. I'm not sure.

BY MR. BARRY:

Q. I'm sorry, could you spell this attorney's name for the record, please.

A. Jim, J-I-M. Vandeberg, V-A-N-D-E-B-E-R-G.

Q. And is Mr. Vandeberg with a law firm?

A. Yes.

Q. What's the name of the law firm?

A. I believe it's called the Otto Law Group, O-T-T-O, Law Group.

Q. Can you explain this debt conversion to me, please.

MR. BRASWELL: Is that a question?

MR. BARRY: I asked him to explain the debt conversion. He said he obtained shares through a debt conversion. So, yes, it's a question.

THE WITNESS:

A. The company had debt, the debt was paid off, shares were issued for that debt.

BY MR. BARRY:

Q. Were you the holder of that debt originally?

A. No.

Q. Who was the holder of the debt originally?

A. I don't know.

Q. You were not the original holder of the debt, right?

A. Correct.

Q. But you somehow came to convert the debt into shares, right?

A. Correct.

Q. How did you obtain the debt, the right to that debt?

A. The mechanics of it?

Q. Yes.

copy form?

A. No.

Q. Do you know an individual by the name of Stuart Cohen?

A. No.

Q. Have you ever heard the name Stuart Cohen before?

A. I don't recall.

Q. How about Eric Littman, do you know an individual by the name of Eric Littman? For the record, that's E-R-I-C, L-I-T-T-M-A-N. And also Stuart Cohen is S-T-U-A-R-T, C-O-H-E-N.

Okay, Mr. Littman, do you know him, sir?

A. I've heard of the name, yes.

Q. How have you heard of Mr. Littman?

A. My understanding was that Mr. Littman was representing the sellers of the Global shell.

Q. And what was that understanding based on?

A. I believe it was a comment made by Mr. Pollak.

Q. And when you say "representing", what do you mean by that?

A. He acted on behalf of the selling side.

Q. I just want to make sure that we're clear

here. When you say acting on behalf of the selling side, do you mean as the owner or in some other capacity?

A. My understanding is he, he was acting on behalf of the sellers.

Q. And who were the sellers of the Global shell?

A. I don't know.

Q. Prior to Global, had you ever heard of Mr. Littman?

A. I don't believe so, no.

Q. Have you conducted any business with Mr. Littman after Global?

A. Definitely not.

Q. Do you know an individual by the name of Conley, that's C-O-N-L-E-Y, Michael, Forey, F-O-R-E-Y?

A. Yes.

Q. And how do you know him?

A. He was my broker in Vancouver. And a friend.

Q. How long have you known Mr. Forey?

A. Around 15 years.

THE WITNESS: May I go to the washroom?

MR. BARRY: Sure. We'll take a break. That's fine.

(Recess taken.)

MR. BARRY: Can you read back the last question and answer, please.

(Record read.)

BY MR. BARRY:

Q. You mentioned that he was a broker of yours in Vancouver?

A. Yes.

Q. Where was he a broker with?

A. He was with Haywood Securities at the time.

Q. Is he still with Haywood Securities?

A. No, he's not.

Q. Do you still have an account with Haywood Securities?

A. Yes, I do.

Q. Have you ever had that account continuously at Haywood Securities since you had it with Mr. Foray?

A. Yes.

Q. And what is that account at Haywood Securities in the name of?

A. I have one in Quantumvest.

Q. Do you have any other accounts at Haywood Securities?

A. And I have a joint account with my wife and I.

Q. Do you still keep in touch with Mr. Forey?

A. Yes, I do.

Q. And where is Mr. Forey currently employed?

A. I believe, from our last conversation, he currently worked for Pan America.

Q. And what is Pan America?

A. It's a brokerage firm based in Panama.

Q. And do you have any accounts at Pan America?

A. Yes.

Q. How many accounts do you have at Pan America?

A. One.

Q. And how long have you had that account?

A. Four or five, six years roughly.

Q. Is Mr. Foray the representative on that account?

A. Yes.

Q. Do you know an individual by the name of Patrick Abraham?

A. I'm sorry, the name does sound familiar, but

BY MR. BARRY:

Q. Mr. Mrakuzic, I've just handed you what's been marked as Exhibit 74. I'll give you some time to review the document.

For the record, it's Bates label DM-008, it's a two-page document, that ends in DM-009.

A. Okay.

Q. Have you seen Exhibit 74 before, sir?

A. Yes, I have.

Q. And what is it?

A. It's a private stock purchase agreement between Quantumvest Holdings and Mr. Panella.

Q. And was this the agreement with Mr. Panella you had referenced just before we went off the record to transfer the 500,000 Global shares to him?

A. Correct.

Q. Was that in cancellation of a debt you owed Mr. Panella?

A. Correct.

Q. What was the amount of the debt?

A. It was in the neighbourhood of this 900,000-dollar figure.

Q. If you'll turn to the second page, Bates labelled DM-009, is that your signature underneath

the Quantumvest Holdings, Ltd.?

A. Yes, it is.

Q. And what's the date of this agreement?

A. The date of the signature is July 27th, '05.

Q. Is that Mr. Panella's signature below as well?

A. I believe it is, yes.

Q. Were you in his presence when he signed this or?

A. No.

Q. This was just a fax, then?

A. Yes.

Q. Where did Quantumvest maintain its brokerage account?

A. There are several. Haywood Securities. Golden Capital, which is no longer Golden. They changed to Global and I think they went to, or were bought out by Pacific International, but that account is no longer open. I've got three, four, five, maybe six places that I can recall right off the top of my head. There may be other places where the account is open but it's been dormant for years with basically nothing in it. So I may miss one or two, but if I did, they are inactive and totally

unrelated.

Q. So where are the active accounts?

A. Most active is, actually, it's been dormant for quite a while, but Haywood was an active place. National Bank Financial out of Toronto. And I guess there was Global, or Golden at the time, which then became Global and merged in January with Pacific International. Those are the three main active.

Q. But that one which would now be at Pacific International is closed, right?

A. Right, yes.

MR. BARRY: I'm going to ask the court reporter to mark Exhibit 75 a composite exhibit.

EXHIBIT 75: Composite document, production to the Securities and Exchange Commission from the British Columbia Securities Commission, Bates labelled number 1 through 53, marked "Confidential"

BY MR. BARRY:

Q. Sir, I've just handed you what's been marked as Exhibit 75.

MR. BARRY: I do have another copy for you if you want it, Mark.

MR. BRASWELL: Yes.

MR. BARRY: I just had to put it in a

separate spot because it's a little bit big.

MR. BRASWELL: M'mm-hmm. Brian, is this a document that you've produced us during the course of --

MR. BARRY: Yes. This are part of the OA docs we sent to you.

MR. BRASWELL: Okay.

MR. BARRY: Just for the record, Exhibit 75 is a production to the Securities and Exchange Commission from the British Columbia Securities Commission Bates labelled number 1 through 53.

Just for your reference, Mark, I entered it as a composite exhibit just because of the business records certificate in front so you know it's a continuous document, because it's, if you look at page 3, you'll see where there's a stamp indicating it's Exhibit A and stamped and then signed by Mr. Peter Chu.

MR. BRASWELL: On what page?

MR. BARRY: Okay, the business records certification from the foreign entity is on page 2. Do you see that, Mr. Peter Chu of Golden Capital Securities Ltd.

MR. BRASWELL: Yes.

other brokerage accounts at the time?

A. Ah, yes.

Q. Where were those brokerage accounts?

A. Haywood Securities. I had one at Canaccord, but it's closed. And I believe I had an account at the National Bank. At that time it was under a different name, they bought a small boutique, but now it's called National Bank.

Q. If you'll turn to the page marked number 6, please. If you look at the area marked "Part 1 - Disclosure of Beneficial Ownership Information"; do you see that?

A. Yes.

Q. Do you see there's an option to check one or two boxes there?

A. Yes.

MR. BRASWELL: Where were you reading from?

MR. BARRY: This is page 6. You see where we're talking about, Mark?

MR. BRASWELL: M'mm-hmm.

BY MR. BARRY: Part 1.

Q. And what box did you check?

A. "I object..."

Q. What is the full section say there?

A. "I object to you disclosing the information described above. I understand that required materials will be delivered to me by Goldman Capital Securities Ltd. and that I will incur fees (as disclosed above) as a result."

Q. And then at the bottom of this page, is that your signature?

A. Yes, it is.

Q. And what's the date?

A. 29th of July, '05.

Q. If you turn to the page that's Bates stamped number 11, please.

A. M'mm-hmm.

Q. We've already discussed the president of Quantumvest Holdings, and secretary. Also here it indicates that you're the treasurer of Quantumvest Holdings. Is that correct?

A. Sole director, officer, everything.

Q. Okay. If you'll turn to page 46, please.

A. Yes.

Q. Do you recognize page 46?

A. I believe it's a monthly, a month-end statement of my account at Golden.

Q. Just looking on this monthly statement, it

indicates off to the right there that it's a statement as of July 31st, 2005. Do you see that?

A. Correct. Yes.

Q. And the first entry in the statement here, you see where it indicates -- or what does that indicate to you, sir, on July 29th?

A. The very first line?

Q. Yes, sir.

A. "6477 cert transfer fee."

Q. Yes. And the description, if any?

A. 326,171 shares of Global Development & Environmental Resources, Inc., courier and handling fee. And then it repeats the number of shares again in Global.

Q. Is that when you remember receiving shares of Global Development in the Quantumvest account at Golden Capital?

A. That was the day of the deposit of the shares in the account of Global.

MR. BRASWELL: At Global or at Golden?

THE WITNESS:

A. Sorry, Golden. Golden.

MR. BARRY:

Q. If you'll turn to page 48 as well.

A. Okay.

Q. What is the name of the document on page 48?

A. "Deposit of United States Registered Issuer Securities Declaration."

Q. Does that indicate that the Global shares were being deposited in Quantumvest Holdings Ltd.'s account with Golden Capital?

A. Correct.

Q. Just looking at the bottom part, there's a numeral (1). Do you see that? It's underneath "Registered Owner / Proposed Transaction Information"?

A. Yes.

Q. And under number (1), it says:

"Are you the legal and beneficial owner of the Securities?"

Do you see that?

A. Yes.

Q. What did you check?

A. "Yes."

Q. And on the following page, 49, is that your signature?

A. Yes, it is.

Q. Also above that, about the middle of the

Q. Are there any buys?

A. I don't see any.

Q. And then looking at the bottom of page 214, do you see a security position report for Global?

A. Yes.

Q. And how many shares are in the account?

A. 571.

MR. BARRY: I'm going to ask the court reporter to mark this document as Exhibit 78, please.

EXHIBIT 78: Document with Bates Nos. 1 through 15, Rahn & Bodmer, Zurich

BY MR. BARRY:

Q. Mr. Mrakuzic, I've just handed you what's been marked as Exhibit 78.

A. Okay.

Q. And for the record this Exhibit 78 is Bates labelled number 1 through 15.

A. Okay.

Q. What is Exhibit 78, sir?

A. It states at the top it is the "Opening of a numbered or code name account and custody account", for R&B, Rahn & Bodmer, Zurich.

Q. And who is the account, custody account

holder?

A. It's my name at the top.

Q. If you'll turn to the page Bates labelled number 2.

A. M'mm-hmm.

Q. On the bottom right-hand corner, is that your signature?

A. Yes, it is.

Q. And what's the date?

A. September 21, '04.

Q. Just turning back to the first page, there's a couple phone numbers. We've already discussed the 604-538-5304. The one just below that, what is that phone number?

A. That's my cell number.

Q. And how long have you had that cell number?

A. Seems like 20 years. It's been a long time. I think that's one original number, cell number.

Q. And who's the carrier for that?

A. Rogers.

Q. And have you had that number continuously for about 20 years?

A. Yes.

Q. And the number below that, what is that?

A. That's a fax number.

Q. 604-542-1172?

A. Yes.

Q. Do you still have that fax number?

A. That fax number is my wife's fax number, but I use it also, yes.

Q. How long have you had that fax number, or your wife had the fax number, excuse me?

A. I believe about February 2000. Early 2000.

Q. Also to the bottom right of this document it appears to be a Xerox of a business card. Do you see that?

A. Yes.

Q. And it indicates JEM Capital Corp?

A. Yes.

Q. What is that?

A. JEM are the initials of my daughter. And it's just easier to read than Quantumvest Holdings.

Q. And does JEM Capital Corp maintain any bank accounts?

A. No.

Q. Does JEM Capital Corp maintain any brokerage accounts?

A. No.

Q. Has it ever?

A. No.

Q. Same with bank accounts, has it ever held any bank accounts?

A. No. It's not a registered company.

Q. Off to the right of your name there's a comment that says "B dot", and it appears to be cut off. Do you know what that is?

A. Oh, "B. Comm", Bachelor of Commerce.

Q. Will you turn to page 3, please. Off to the right-hand side at the top, do you see where there's an area to check off?

A. Yes.

Q. And what is the box that's checked off there?

A. It reads:
"that the contracting partner is the sole beneficial owner of the assets concerned."

Q. Is that you?

A. Yes.

Q. Do you still maintain this account with Rahn & Bodmer?

A. It's inactive.

Q. And what do you mean by "inactive"?

A. There's been no activity in the account.

Q. But it is still open, though?

A. That has not been officially determined pending the events that are taking place right now. So it's suspended. Let's put it that way.

Q. Who suspended it?

A. They did.

Q. Will you turn to page 14, too, please.

A. Okay.

Q. Do you see where there's another area to check off one of two blocks at the top right-hand corner?

A. Yes.

Q. And you see the box that's checked off there?

A. Yes.

Q. And what does that say?

A. "not in my name but in the name of the Bank as nominee/trustee on my behalf."

Q. What is that referring to?

A. I don't know. This is an internal document. I don't know what they mean by that.

Q. If you look above that, is it referring to the registration of shares for this account?

A. Ah... I'm sorry, you're referring to the paragraph above that?

Q. Yes, sir. Right above that. Well, then we can actually read it. It says:

"I hereby order and authorize Rahn & Bodmer (hereinafter: the Bank) to arrange for the registration of shares, purchased and to be purchased by me in the future, of Swiss companies in the share registers of the companies concerned."

And then the box checked was:

"not in my name but in the name of the Bank as nominees/trustee on the behalf."

Is that correct?

A. Yes.

MR. BARRY: I'm going to ask the court reporter to mark Exhibit 79.

EXHIBIT 79: One-page document, Bates No. DM-155, e-mail from Peyer Markus Hr. to Darko Mrakuzic, August 10, 2005

BY MR. BARRY:

Q. What is Exhibit 79, sir?

A. It appears to be a fax from myself to Rahn & Bodmer.

Q. Is it a --

A. Sorry, an e-mail. Let me correct that. It is an e-mail.

Q. And just for the record, it's Bates DM-155. And looking at the bottom text there, or the bottom e-mail message, the original message, as it's indicated, who was that from?

A. From Peyer Markus.

Q. And who was that?

A. He's my contact there.

Q. At Rahn & Bodmer?

A. Yes.

Q. And that's addressed to you, right?

A. Correct.

Q. What's the date of this e-mail message, the original message?

A. It was sent August 9th, 2005.

Q. And the text below that indicates:

"Dear Darko.

We just received the o.k. from SASI. The shares tradeable as per today.

Best regards,

Markus."

Did I read that right?

A. Yes.

Q. And what is SASI?

A. I don't know.

Q. Would you please read your response to Mr. Markus.

A. "That is great news.

Let's start by selling 5k-6k [meaning thousand] every nickel beginning at $4.35.

Thank you.

Darko."

Q. Had you spoken to Mr. Markus or communicated with Mr. Markus in any way other than e-mail?

A. I had spoken to him on the phone on occasion.

Q. Had you spoken to him in regards to when shares would be tradeable?

A. I don't recall whether that was via e-mail or telephone.

Q. And do you see the subject of -- well, disregard.

MR. BRASWELL: Do you have a copy of 79?

MR. BARRY: I don't have an extra copy of that one. I apologize.

MR. BRASWELL: Okay.

BY MR. BARRY:

you off the break, Brian, against my better advice or judgment, I'm going to ask my client a couple questions.

EXAMINATION BY MR. BRASWELL:

Q. Mr. Mrakuzic, I refer you to Exhibit 32, Mr. Mrakuzic, which was previously marked. This is the three-page exhibit that is three one-page notices of conversion.

A. Yes, I remember seeing that.

Q. Do you remember your testimony earlier today about that?

A. To a degree, yes.

Q. The first page of Exhibit 32 is a notice of conversion on behalf of Rahn & Bodmer?

A. Yes.

Q. Did your signature on that document result in the misappropriation or misdirection of Global shares to anyone other than yourself?

A. No, it did not.

Q. I'll ask you the same question about Quantumvest. Your signature there on behalf of Quantumvest, did that result in the misdirection or misappropriation of Global shares?

A. No, it did not.

Q. Quantumvest is your company?

A. It is, but I only received 326,171.

Q. And why is that?

A. Ah, 500,000 went to Mr. Panella for a previous obligation and 100,000 shares went to Mr. Kletas which he purchased in a private stock transaction.

Q. So the certificate for Quantumvest for 926,171 you broke into three smaller certificates?

A. Correct.

Q. Turn to the last page of Exhibit 32. This is the conversion on behalf of Pan American Capital Group. Do you see that?

A. Yes.

Q. And I think you previously testified that Mr. Panella signed that at your request?

A. Correct.

Q. Did his signature on that page result in the misdirection or misappropriation of Global shares to anyone other than yourself?

A. No, it did not.

Q. That's probably a bad question since it suggests that somehow you misappropriated to yourself. But my point is, these shares all went to

you as a result of Mr. Panella's signature?

A. Correct.

Q. And as a result of your signature on behalf of Rahn & Bodmer, they went to you as well?

A. Correct.

Q. Is there a reason why a third of the shares went to a Swiss entity outside of Canada and another third went to a Panamanian entity outside of Canada?

A. These jurisdictions have different tax implications.

Q. How do you know that?

A. Through the advice of my tax lawyer.

Q. And who is that?

A. Mr. Max Wandinger.

MR. BRASWELL: No further questions.

BY MR. BARRY: I have a few just on that based on your last question.

FURTHER EXAMINATION BY MR. BARRY:

Q. You just mentioned your tax attorney is Mr. Max Wandinger?

A. Correct.

Q. And how long have you known Mr. Wandinger?

A. I believe at least 15 years.

Q. And you've known him for 15 years, you say?

A. Approximately 15 years, yes.

Q. Have you been a client of his for approximately 15 years as well?

A. No. No, I have not.

Q. Any point in that past 15 years has Mr. Wandinger had his license to practice law revoked?

A. I believe for a short period of time he did. But he -- again, he is practising. He has his license back.

Q. And do you know the nature of the reason his license to practice law was revoked?

A. I don't know the details of that, no.

Q. Do you know if it was in any way related to securities transactions?

MR. BRASWELL: Asked and answered, argumentative. He's already said he doesn't know.

THE WITNESS:

A. I do not know the details of that.

BY MR. BARRY:

Q. I understand you may not know the details, but do you know if it had any connection to securities?

A. I don't know that.

## REPORTER'S CERTIFICATION

I, Nancy Nielsen, RCR, RPR, CSR(A), Official Realtime Reporter in the Provinces of British Columbia and Alberta, Canada, do hereby certify:

That the foregoing deposition was taken down by me in shorthand at the time and place herein set forth and thereafter transcribed, and the same is a true and correct and complete transcript of said deposition to the best of my skill and ability;

That the deposition is a full, true, and complete transcript of the testimony of DARKO MRAKUZIC, including all questions, answers, objections, motions, and exceptions;

That the witness, before examination, was by me duly affirmed to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney, or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney **BRIAN K. BARRY**.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 29th day of April, 2009.

**Nancy Nielsen, RCR, RPR, CSR(A)**
**Official Realtime Reporter**